# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-CT-00791-SCT

*UNIVERSITY OF MISSISSIPPI MEDICAL CENTER*

*v.*

*DONNIE FOSTER AND SHIRLEY FOSTER AS LEGAL GUARDIANS OF THE MINOR CHILD, MALIK R. CALDWELL AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF TAMIKA FOSTER*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 01/04/2010 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT H. PEDERSEN |
| | WALTER T. JOHNSON |
| | JOSEPH GEORGE BALADI |
| ATTORNEY FOR APPELLEE: | DAVID C. DUNBAR |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED - 02/14/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC**.

**DICKINSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Tamika Foster died after giving birth at the University of Mississippi Medical Center (UMMC). This wrongful-death suit followed. After a verdict for the plaintiffs, UMMC appealed, claiming that the plaintiffs produced nothing more than an unreliable autopsy

report to establish medical negligence, and that the trial judge erred in refusing to allow two doctors to testify about the autopsy. But because we find sufficient evidence in the record to support the verdict and because UMMC failed to make a proffer of the doctors' expected testimony, we reverse the Court of Appeals' decision and reinstate and affirm the decision of the Hinds County Circuit Court.

## FACTS AND PROCEDURAL HISTORY

¶2. Physicians at UMMC provided prenatal care to Tamika Foster during her high-risk pregnancy. When she presented with troubling symptoms, her physicians admitted her to UMMC and diagnosed her with Class I hemolysis, elevated liver enzyme levels, and low-platelet-count syndrome (HELLP).

¶3. That same day, she delivered her baby – Malik – by cesarean section under emergency circumstances. After the delivery, she recovered in the intensive care unit and later was returned to the labor and delivery unit. The following day, she went into respiratory arrest and died.

¶4. UMMC pathologists performed an autopsy and determined that Foster's death was caused by "myocardial ischemia with arrhythmia secondary to Thrombotic Thrombocytopenia Purpura" (TTP), meaning she died from arrhythmia caused by TTP. Although HELLP and TTP are both serious complications that cause a decrease in the number of platelets in the blood, the course of treatment for the two is not the same.

¶5. According to Dr. Charles Greenberg, the plaintiffs' hematology expert, the ADAMTS13 is the only laboratory test that could distinguish between TTP and HELLP.

2

Approximately nine hours after Foster died, the pathologists ran an ADAMTS13 test using a postmortem sample of Foster's blood. The pathologists considered these results and Foster's medical history to conclude that she had died from complications of TTP. Foster's death certificate, completed before the autopsy report, did not mention TTP. Instead, it stated that the cause of death was "undetermined," but listed HELLP under "other significant conditions."

¶6. Foster's parents, as representatives of Malik, and Foster's wrongful-death beneficiaries, sued UMMC under the Mississippi Tort Claims Act,[1] alleging Foster died from TTP, a condition UMMC failed to properly diagnose and treat. At trial, UMMC's theory of the case was that Foster had died from HELLP and not TTP. They argued that the reason its pathologists incorrectly concluded that TTP had caused Foster's death was because they had conducted the ADAMTS13 test using postmortem blood which – although once acceptable – recently has been shown to produce inaccurate results.

¶7. Hinds County Circuit Judge Tomie Green, after hearing the evidence without a jury, found that UMMC's failure to properly diagnose and treat Foster for TTP proximately caused her death. Judge Green awarded the plaintiffs $1,230,965, which she reduced to the statutory limit of $500,000.

¶8. UMMC timely appealed, alleging that Judge Green unreasonably relied on the autopsy report, and that she committed reversible error by refusing to allow UMMC's experts to

---

[1] Miss. Code Ann. §§11-46-1 to 23 (Rev. 2012).

3

testify about the autopsy report. The Court of Appeals, agreeing with UMMC on both arguments, reversed and rendered the judgment. The Fosters petitioned this Court for a writ of certiorari, which we granted.

**ANALYSIS**

¶9.    UMMC raises two issues on appeal: whether Judge Green's finding that Foster died from TTP was supported by substantial evidence; and whether Judge Green committed reversible error by failing to allow UMMC's expert witnesses to "comment about the content of the autopsy report."

¶10.    UMMC's argument challenges the sufficiency of the evidence. We have held that "'[a] circuit court judge sitting without a jury is accorded the same deference with regard to his [or her] findings as a chancellor,' and his [or her] findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence" in the record.[2]

¶11.    Because we "will not disturb those findings unless they are manifestly wrong, clearly erroneous or an erroneous legal standard was applied"[3] we now look to see whether Judge Green had substantial medical evidence before her to conclude that Foster died of TTP.[4]

> **The record contains substantial evidence to support Judge Green's finding that Foster died from TTP.**

---

[2]*City of Jackson v. Perry*, 764 So. 2d 373, 376 (Miss. 2000) (citations omitted).

[3]*Id.*

[4]*See **Univ. of Miss. Med. Ctr. v. Pounders,*** 970 So. 2d 141, 147 (Miss. 2007).

4

¶12.    The factual dispute upon which this issue turns is whether, as the plaintiffs claim, Foster died of undiagnosed and untreated TTP; or whether, as UMMC claims, she had HELLP, and was properly diagnosed with, and treated for, HELLP.  Commenting on this issue, the Court of Appeals stated that "there was no expert testimony which supported to a reasonable degree of medical certainty the notion that Foster had TTP," and that it could find no "testimony directly linking Foster to having had TTP. . . ."[5]  After reviewing the record, we reach a different conclusion.

*The autopsy report*

¶13.    Three days following Foster's death, two UMMC pathologists performed an autopsy and concluded that her cause of death was myocardial ischemia with arrhythmia secondary to TTP.  The autopsy report – which included the pathologists' opinions as to Foster's cause of death – was admitted into evidence without objection.

¶14.    UMMC now finds itself in the unusual position of challenging the reliability and sufficiency of the opinions of its own pathologists, who clearly are capable of making admissions on behalf of UMMC.  Neither of the pathologists testified at trial, and no evidence was introduced that they had changed their minds, or that Foster's cause of death was anything but TTP.  Even if they had, UMMC cites no authority – and we know of none – for the proposition that a party's admissions cease to be admissions simply because the party later recants or denies them.

---

[5] ***Univ. of Miss. Med. Ctr. v. Foster***, 2010-CA-00791-COA (¶¶17-18), 2011 WL 6157338, *5 (Miss. Ct. App. Dec. 13, 2011).

¶15.   A strong argument could be made that the admissions of the two UMMC pathologists, without more, sufficiently supported Judge Green's finding that Foster died of TTP. But we need not consider that argument because there is more.

*Dr. James Martin's article*

¶16.   One of Foster's treating physicians was Dr. James Martin, chief of maternal fetal medicine and obstetrics at UMMC. In a scholarly article, Dr. Martin described Foster as "a patient considered to have [HELLP] syndrome, ***but later determined to have [TTP]***."[6] In its brief to this Court, UMMC says Dr. Martin made no admission in the article that Foster had died from TTP. We disagree.

*Dr. Charles Greenberg*

¶17.   One of the plaintiffs' expert witnesses was Dr. Charles Greenberg, a board-certified hematologist who has served on the faculties of the University of California and Duke University, and who currently serves on the faculty of the University of South Carolina. Dr. Greenberg testified that TTP caused Foster's death:

> [I]t's supported by the medical literature. It's supported by James George's[7] articles. It's supported even by Joe Moake's[8] UMMC hematologist articles.

---

[6] Jonathan F. Rehberg, M.D.; Christian M. Briery M.D.; William T. Hudson, M.D.; James A. Bofill, M.D.; James N. Martin, M.D., *Thrombotic Thrombocytopenic Purpura Masquerading as Hemolysis, Elevated Liver Enzymes, Low Platelets (HELLP) Syndrome in Late Pregnancy*, in 108 Obstetrics & Gynecology, 817-820 (2006) (emphasis added).

[7] Dr. George is head of hematology at the University of Oklahoma. According to Dr. Greenberg, Dr. George is "recognized as a leader for thrombocytotenia . . . including pregnancy and TTP."

[8] Dr. Moake is a UMMC hematologist who testified by deposition.

6

And I'm still confused about why he doesn't think it's TTP. ***It was TTP that killed her***.[9]

¶18.   Dr. Greenberg's testimony clearly refutes the Court of Appeals' finding that the record contained no "testimony directly linking Foster to having had TTP," and it refutes UMMC's argument that, other than the autopsy report, "no other evidence in the record is sufficient to support [Judge Green's] finding that Ms. Foster had and died from TTP."

¶19.   UMMC's counsel argues that UMMC's admissions in both the autopsy report and Dr. Martin's article concerning the diagnosis of TTP should be disregarded as unreliable.  Both relied on the results of a test that used postmortem blood, which – UMMC argues it has now learned – produces false results.  In support of its argument, UMMC says:

> A study published on February 27, 2009 concluded that "[P]ostmortem ADAMTS13 activity levels may not be valid in establishing a diagnosis of TTP, and high inhibitor levels in this setting may be related to elevated PFH. Caution must be used in the interpretation of ADAMTS13 testing in the presence of hemolysis."

¶20.   UMMC's counsel cross-examined Dr. Greenberg at length about the validity of using postmortem blood in ADAMTS13 testing for TTP, presenting him with the 2009 article that UMMC says calls the practice into question.  Dr. Greenberg, however, did not change his opinion that the test was valid.  He testified:

> In this article . . . they raised caution and I believe it's fair to raise caution.  It does not invalidate an autopsy done in 2005, it doesn't refute the reliability of that sample.  It's just it raises some caution.  It was standard practice, it probably will remain to be standard practice for a while until we can get a specific antibody for [sic] perhaps ISA for that.

---

[9] (Emphasis added.)

¶21.   UMMC based its argument that "new scientific knowledge" made the ADAMTS13

test unreliable – when performed using postmortem blood – on an article from the Journal

of Clinical Apheresis[10] and the testimony of its experts, Doctors Bofill, Moake, and Griffin,

who opined that conducting an ADAMTS13 test with postmortem blood yields invalid

results.

¶22.   The Journal of Clinical Apheresis article raised caution in diagnosing TTP

postmortem because "low postmortem ADAMTS13 activity and evidence of inhibitor can

occur in decedents without clinical or histologic evidence of TTP." The article concluded

"postmortem ADAMTS13 levels may not be valid in establishing a diagnosis of TTP" and

"[c]aution must be used in the interpretation of ADAMTS13 testing in the presence of

hemolysis."[11]

¶23.   Dr. Greenberg, however, testified that, as of 2005, an ADAMTS13 test using

postmortem blood was the standard, accepted way to "confirm and diagnose TTP in the

postmortem period."  He further stated that it "does not invalidate an autopsy done in 2005,"

and that "it was TTP that killed her."

¶24.   Dr. Martin's article – co-authored by Dr. Bofill and three other members of the

Department of Obstetrics and Gynecology at UMMC – reexamined Foster's case and course

of treatment after her death. In this article, they accepted, rather than challenged, the

---

[10] D.M. Dwyre, et al., *Value of ADAMTS13 Activity and Inhibitor in the Postmortem Diagnosis of Thrombotic Thrombocytopenic Purpura*, in J. Clinical Apheresis (Feb. 27, 2009).

[11]*Id.*

pathologists' finding that TTP had caused Foster's death, based on the results from the ADAMTS13 test and Foster's signs and symptoms of TTP.

¶25.    As already stated, Dr. Greenberg testified that, based upon the signs and symptoms documented in Foster's medical records and the ADAMTS13 test results finding both low ADAMTS13 activity and presence of antibody inhibitor, she died of TTP.  He also pointed out that Foster's tissue samples showed the presence of microthrombi.  Dr. Bofill admitted – and the lab results reported in the Journal of Medical Apheresis article showed – that the presence of microthrombi in the tissue samples is consistent with TTP.

¶26.    The experts' testimony in this case conflicts considerably, and we consistently have held that the trier of fact is to resolve conflicting testimony.[12]  We ordinarily will not disturb those findings merely because the judge adopts the testimony of one party's experts over the views expressed by another party's experts.[13]

> **Judge Green did not refuse "to allow UMMC's expert and UMMC's treating physician to comment about the content of the autopsy report," as claimed by UMMC.**

¶27.    UMMC next argues that the trial court erred by excluding testimony of Dr. Baha Sibai's and Dr. Martin.  We first must determine what testimony, if any, Judge Green excluded so we can fairly decide if it should have been admitted. But, first, we review what actually happened at trial.

_____

[12] *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 746 (Miss. 2008).

[13] *Id.* at 748.

*Dr. Baha Sibai*

¶28.    In its designation of experts, as supplemented, UMMC designated Dr. Sibai as an expert in obstetrics and gynecology to "give general testimony about the care given to Tamika Foster and the rationale behind the treatment."  The designation also disclosed, in general terms, that Dr. Sibai was expected to testify about HELLP and TTP, but it never mentioned any expected opinions related to the autopsy report or the pathologists' opinions.

¶29.    During Dr. Sibai's direct testimony at trial, UMMC's counsel began questioning him about the autopsy report findings. Plaintiffs' counsel objected to Dr. Sibai's "commentary about the autopsy and the findings of the autopsy," arguing that they were outside his area of expertise.  Judge Green sustained the objection, stating to the witness: "[Y]ou can't testify to the pathology report as to physicians who are pathologists, and that's outside your area of expertise."

¶30.    When Dr. Sibai's testimony continued, UMMC's counsel asked: "[a]nd TTP patients, what type of things would you expect to see in the patients who you've treated for TTP who died and you reviewed the report.  What would you see?"  Plaintiffs' counsel again objected.  Although Judge Green never ruled on the objection, a discussion ensued, ending with Judge Green asking: "[W]hy are we going through the autopsy report?"  UMMC's counsel answered: "I'm not going to continue going through it if I could just ask two questions."  Judge Green responded: "If you would ask those two questions, then we will be on our way."  After the above exchange, UMMC's counsel asked several more questions, without objection

10

and tendered the witness. And it appears to us that the trial judge ultimately allowed UMMC's counsel to ask Dr. Sibai the questions he wanted to ask.

*Dr. James Martin*

¶31.   UMMC also designated Dr. James Martin as an expert in obstetrics and gynecology. According to UMMC, Dr. Martin was expected to testify about Foster's medical condition, her treatment, and his opinion that she had HELLP syndrome. The designation mentions neither the pathologists' opinions nor the autopsy report.

¶32.   Dr. Martin testified at length – without objection – about Foster's medical condition, her care and treatment at UMMC, his opinion that she died of HELLP, and that UMMC followed the standard of care in treating her. When UMMC's counsel began to ask questions about the autopsy, Judge Green – on her own and not in response to an objection – told UMMC's counsel:

> I'm going to limit you, counsel, in terms of the autopsy report the same as I did with Dr. Sibai. So let's move along. This was done at University by the pathology department. So let's don't get too deep into it.

UMMC's counsel responded: "I won't."

¶33.   Following this exchange, Dr. Martin testified – without objection – about the substance of discussions that took place at an autopsy conference he attended at the request of the pathology department.

> **UMMC failed to make a proffer of the testimony it expected from Dr. Sibai or Dr. Martin.**

11

¶34. UMMC alleges in its brief that Judge Green prohibited Dr. Sibai and Dr. Martin from testifying "about the autopsy report." We are unable to find any such prohibition in the record. Judge Green prohibited Dr. Sibai from giving "opinions about" the pathology report, because, as she put it, "I think that he's not an expert in pathology, and I wouldn't let a pathologist get here and testify to his work." She later applied the same ruling to Dr. Martin.

¶35. We might view this issue differently, had UMMC's counsel brought to our attention some reasonably specific testimony or opinion it wished to elicit from Dr. Sibai and Dr. Martin. But without a proffer, Judge Green had no opportunity to correct the mistake (if there was one), and we have no way to judge whether the opinions UMMC claims were excluded, were sufficiently important to require reversal. Rule 103 of the Mississippi Rules of Evidence states:

> Error may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected, and . . . the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.[14]

¶36. In speaking to this issue, we have said that we will not reverse a judgment unless it can be shown, upon examining the record, that the "error was actually prejudicial and harmful to the rights of the complaining party."[15] And we:

---

[14]Miss. R. Evid. 103.

[15]*Illinois Cent. R. Co. v. Benoit Gin Co.*, 248 So. 2d 426, 429 (Miss. 1971) (citations omitted).

must be able to see from the record itself whether the offered testimony would be material and of benefit to the merits of the case, and whether its exclusion was actually harmful and prejudicial to the [proponent of the evidence].[16]

¶37. "In the absence of a meaningful proffer, we cannot place the lower court in error."[17] Therefore, because UMMC's counsel failed to make a proffer at trial, or to this Court on appeal, we affirm the trial court's ruling.

## CONCLUSION

¶38. The Court of Appeals erred in reversing and rendering judgment in favor of UMMC. The trial judge's findings were supported by substantial credible evidence, and any error associated with Judge Green's ruling on expert testimony was not preserved with an appropriate proffer of the expected testimony. Therefore, we reverse the judgment of the Court of Appeals and reinstate and affirm the judgment of the Hinds County Circuit Court.

¶39. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED**.

**WALLER, C.J., RANDOLPH, P.J., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR**.

---

[16] ***Dazet v. Bass,*** 254 So. 2d 183, 187-88 (Miss. 1971).

[17]*See **Knotts by Knotts v. Hassell***, 659 So. 2d 886, 891 (Miss. 1995) (finding no reversible error when the trial court excluded plaintiff's expert on the ground that the testimony would be cumulative when plaintiff failed to make a proffer for court to determine if the testimony would be different or noncumulative).