# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00438-COA

JOSHUA TAYLOR CARNLEY                                    APPELLANT

v.

STATE OF MISSISSIPPI                                         APPELLEE

DATE OF JUDGMENT:               04/14/2021
TRIAL JUDGE:                    HON. CALEB ELIAS MAY
COURT FROM WHICH APPEALED:      NEWTON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         W. TERRELL STUBBS
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY: LAUREN GABRIELLE CANTRELL
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 10/11/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     A jury convicted a man of rape.  He raises five issues on appeal.   Finding no error, we affirm.

## FACTS

¶2.     Samantha was sixteen years old when Joshua Carnley began messaging her on two social media websites.[1]  They exchanged messages consistently from that point until he "started to be more . . . sexual."  As a result, she blocked him from one of her socials.

¶3.     But Carnley was persistent.  He began messaging her on the unblocked website, and

---

[1] The Court of Appeals declines to identify victims of sexual assault, and the name used is a pseudonym.

the two started to communicate again. Weeks later, Carnley and Samantha made plans for the teenager to sneak out of her house. In the conversations leading up to them meeting, they talked about what they expected would happen. Samantha stated she expected the two to "ride around, listen to music, [and] maybe" experience her "first kiss." She said she "made it clear" she "didn't want to do that yet," referring to sexual intercourse.

¶4.     On the night of the incident, the teenager told Carnley when to pick her up. Carnley pulled in front of her house, and she got into the car. He drove off and told her they were going to "his spot." Samantha described the area as "just a dirt road with . . . no lights at all." Once there, the two got into the back seat of Carnley's car and began kissing. Carnley then pulled down his pants. Samantha tried to push him away, but he persisted.

¶5.     He asked her whether she had ever performed oral sex. She said "no," and Carnley attempted to force her. Samantha hit him several times in hopes that he would stop. Instead, Carnley tried to take off her pants. She told him multiple times, "I'm not ready. I don't really want to do this." But Carnley continued pulling down Samantha's pants. He grabbed a condom, put it on, and proceeded to force himself on the teenager.

¶6.     So Samantha placed her hand between her legs in a defensive position. She stated that as she tried to stop Carnley, her fingernail "ripped" the condom. He rolled down the window, threw the condom on the ground, and grabbed another one. Still on the defensive, Samantha tried to stop Carnley, but he proceeded to penetrate her. Afterwards Carnley threw the second condom out of the window. The two got back into the front seats of his car. Carnley then drove her back home.

¶7. That same night, Samantha texted her friend and told her what happened. Her friend told her to tell her mom; but Samantha stated she was "scared," so she texted her aunt instead. Concerned, the aunt told Samantha's mother about their conversation.

¶8. From that point, the teenager went through an extensive series of interviews and examinations. First, she was examined at St. Dominic's Hospital in Jackson. Then, her mother took her to the police station where Samantha filed a report. Two days later, Samantha underwent another examination by her mother's gynecologist. She also underwent a forensic interview conducted by the Wesley House in Meridian.

¶9. Carnley was later arrested and indicted for rape.

## PROCEDURAL HISTORY

¶10. At trial, Samantha testified about the details of the incident. One point of contention involved whether penetration occurred. The teenager was asked "[b]efore the first condom broke, did he go inside of you?" She replied, "No, sir. I kept . . . my hand there." During cross-examination, defense counsel asked about the statements she had allegedly given the police. For instance, he asked Samantha if she recalled telling the officer that the first condom broke during penetration. She stated, "No, sir." But at no point did counsel try to introduce the alleged prior statements or show them to Samantha.

¶11. The officer who met with the victim and her mother also testified. The officer stated he "sat down" with them and "conducted an interview." The officer testified Samantha was unable to tell him a "specific location" where the incident happened. He said he asked her if he could "drive her or [if] she could see the area, would she be able to direct [him]" to the

3

exact location. They got into his patrol car, and Samantha led him to the location. He said she told him about the condoms that Carnley threw out of the window. The officer testified that once they arrived at the location, he "found one broken condom and one condom still intact[.]"

¶12. On cross-examination, the officer was asked if he had videotaped a statement from the Samantha. The officer stated he had. Counsel for Carnley attempted to ask about the victim's statements during the interview, but the State objected on hearsay grounds. Carnley argued the statements were admissible as prior inconsistent statements. But the State responded the statements were only admissible if Samantha was on the stand to confirm or deny them, but not through a different witness. The trial court sustained the objection.

¶13. Carnley's trial counsel later argued that the "purpose in asking those questions of [the officer was] to play the video" of the alleged prior statement. However, counsel never proffered the officer's testimony or the video of the interview.

¶14. The gynecologist testified next. He recounted his ample educational qualifications and experience in the field of gynecology and explained that part of his job included examining women who had been victims of sexual assault. The State then tendered the doctor as an expert in the field of gynecology. In response, defense counsel stated, "I don't have any objection to that, Your Honor." The trial court subsequently accepted him as an expert.

¶15. The doctor then testified regarding his examination of Samantha. He stated she told him that she had been "forced to attempt . . . oral intercourse" and that [Carnley] "penetrated

4

her." He also recalled he asked Samantha whether she "ask [Carnley] to stop." He testified she had told him, "Yes, I did."

¶16. The doctor described the victim as "visibly, emotionally upset" and testified he "had to stay through most of the afternoon and into the early evening just to get [Samantha] at ease." The doctor testified he then performed a physical examination of the teenager and ultimately found three lacerations that were consistent with someone who had been a victim of sexual assault.

¶17. When asked if he had an opinion on whether Samantha had been sexually assaulted, he replied, "I believe she was." The State then asked the doctor what was his opinion based on. He stated:

> Twenty years of doing this. I examined a lot of people with their first intercourse. I've examined people with traumatic intercourse, but consensual intercourse. This is a totally different emotional and physical findings on this young lady that stirred both me and my nurse to the point that I have no doubt in my mind that it was performed in the wrong way.

¶18. Carnley took the stand in his own defense. He stated he never attempted to force Samantha to perform oral sex, nor did he force himself on her. He told the jury the teenager consented to sexual intercourse with him on that night and that she never resisted.

¶19. After an hour of deliberating, the jury sent a note to the trial court asking, "If we can't all agree on a verdict after deliberations, what do we need to do?" The trial court then asked the attorneys, "What do y'all recommend we do?" Conferring with the attorneys, the trial court stated it could "do a *Sharplin* instruction" or "write on here just keep going." Both attorneys agreed it was "a little early" for a *Sharplin* instruction. "All right," declared the

trial court, "I'm just going to put [']continue your deliberations,['] and that's it. Any objection?" The State responded, "No, sir." The trial court instructed the jurors, "Continue your deliberations."

¶20. The jury found Carnley guilty of rape. He was sentenced to serve ten years in the custody of the Mississippi Department of Corrections. He raises five issues on appeal.

## DISCUSSION

### I. The exclusion of the victim's alleged prior inconsistent statement does not require reversal.

¶21. Carnley argues the trial court erred by not allowing him to impeach Samantha with her alleged prior inconsistent statements to the police officer.

¶22. "The relevance and admission or exclusion of evidence is a matter of the trial court's discretion that will be reversed only for an abuse of discretion which results in prejudice to a party." *Booker v. State*, 64 So. 3d 988, 998 (¶29) (Miss. Ct. App. 2010). "However, the trial court must exercise its discretion within the bounds of the Mississippi Rules of Evidence." *Id*.

¶23. Additionally, "[w]e recognize the Supreme Court's long-held rule that when testimony is not allowed at trial, a record of the proffered testimony must be made in order to preserve the point for appeal." *Evans v. State*, 294 So. 3d 664, 667 (¶12) (Miss. Ct. App. 2020).

¶24. Carnley argues the exclusion Samantha's prior statement to the officer substantially prejudiced his defense. In its brief, the State agreed with Carnley that the exclusion of the

officer's testimony was error but maintained that it was harmless.[2]

¶25. Here, Carnley's trial counsel drew out an objection from the State when he asked the officer about Samantha's statements during their interview. While the trial court sustained the objection, Carnley's trial counsel never proffered the officer's testimony, nor did he proffer the video recording of the officer's interview with the victim.

¶26. Even if there were error, we cannot fully review this issue because Carnley's trial counsel failed to proffer Samantha's statements to the police officer. Our Court "must be able to see from the record itself whether the offered testimony would be material and of benefit to the merits of this case, and whether its exclusion was actually harmful and prejudicial to the proponent of the evidence." *Univ. of Miss. Med. Ctr. v. Foster*, 107 So. 3d 149, 155 (¶36). Absent a proffer of the allegedly contradicting videotape, we cannot determine whether the exclusion of the evidence was "harmful and prejudicial" to Carnley.

¶27. We decline to reverse on this ground.

## II. The expert witness' testimony was proper.

¶28. Carnley argues the trial court erred by admitting the gynecologist's testimony because he testified regarding Samantha's mental state, which was outside the scope of his designation.

¶29. "Our well-established standard of review for reviewing the trial court's admissibility of evidence, including expert witness testimony, is abuse of discretion." *Jones v. State*, 918 So. 2d 1220, 1223 (¶9) (Miss. 2005). "Unless we can safely say that the trial court abused

---

[2] The State abandoned this position during oral argument, asserting that the exclusion did not constitute error.

its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case, or the accused in a criminal case, we will affirm the trial court's ruling." *Id*.

¶30. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or *personally observed*." M.R.E. 703 (emphasis added). "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible." *Id*.

¶31. Carnley argues the expert's testimony regarding Samantha's emotional state was outside of his expertise in gynecology. Yet he admits his trial counsel never objected to the doctor's testimony and asks this Court to review his argument under the plain-error doctrine.

¶32. "The plain-error doctrine is employed only in situations when a defendant's substantive or fundamental rights are affected." *Swinney v. State*, 241 So. 3d 599, 605 (¶14) (Miss. 2018). "Plain-error is properly utilized for correcting obvious instances of injustice or misapplied law." *Id*. "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id*.

¶33. Here, the gynecologist's testimony was based on facts or data he personally observed. He testified that Samantha was not only emotionally upset from the encounter, but visibly so. The teenager was so disturbed, the doctor had to stay most of the afternoon and into the early evening just to get her enough at ease to perform the examination. Monitoring the patient's emotional state was a vital part of how and when the doctor performed his examination.

¶34. But the expert's conclusion did not come from observing Samantha's emotional state

8

alone. As the doctor stated, his conclusion was based on both emotional *and* physical findings. He testified he personally performed a physical examination of Samantha, and during the examination, he found three lacerations that were consistent with someone who had been sexually assaulted.

¶35. Carnley further argues the expert's testimony was improper because it included hearsay statements. Specifically, Carnley argues the doctor's testimony about Samantha's recollection of events constituted hearsay. However, statements made for purposes of medical diagnosis or treatment fall within an exception to the hearsay rule. M.R.E. 803(4).

¶36. Because Carnley's "substantive or fundamental rights [were not] affected, his plain-error argument also fails." *Swinney*, 241 So. 3d at 605. We find no plain error.

### III. Carnley's trial counsel was not ineffective.

¶37. Carnley next argues his trial counsel was ineffective because he failed to: (1) properly impeach the victim's previous inconsistent statements; (2) adequately rebut the State's expert witness; (3) raise hearsay objections; and (4) request further DNA testing.

¶38. "Generally, ineffective assistance of counsel claims are more appropriately brought during post-conviction proceedings." *Dartez v. State*, 177 So. 3d 420, 423-24 (¶18) (Miss. 2015). "We will reach the merits on an ineffective-assistance of counsel claim only in instances where (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Collins v. State*, 221 So. 3d 366, 372 (¶19) (Miss. Ct. App. 2016). This Court has also resolved

ineffective-assistance-of-counsel claims on direct appeal when the record affirmatively shows that the claims are without merit. *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020). Because the parties did not stipulate that the record was adequate for this Court to review the issue, we will determine "whether the record affirmatively shows ineffectiveness of constitutional dimensions." *Id*.

¶39.    To prevail on a claim for ineffective assistance of counsel, Carnley must prove "counsel's performance was deficient," and "the deficient performance prejudiced the defendant." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 100-01 (1955)). "This Court rarely second guesses trial counsel regarding matters of strategy." *Renfrow v. State*, 202 So. 3d 633, 636 (¶8) (Miss. Ct. App. 2016).

### A.    *Carnley's first three arguments fall within the ambit of trial strategy.*

¶40.    Carnley's argues his trial counsel was ineffective because he failed to: (1) properly impeach the victim's previous inconsistent statements; (2) adequately rebut the State's expert witness; and (3) raise hearsay objections.

¶41.    While we will not theorize regarding what the exact strategy was behind trial counsel's decisions, it is conceivable that the decision to not impeach Samantha's testimony through admission of a recording was strategic, especially if the video did not contain

10

statements explicitly contradicting her trial testimony. Defense counsel may have also sought to evade possible ire from a tough cross-examination of a teenaged victim. Regarding his second argument, trial counsel also could have chosen to refrain from a hostile cross-examination of an expert with twenty years of experience.

¶42. Regarding the argument that trial counsel failed to make hearsay objections, this Court has held that "counsel's choice of whether or not to file certain motions, call certain witnesses, ask certain questions, or *make certain objections* fall within the ambit of trial strategy." *Sandlin v. State*, 312 So. 3d 1191, 1197 (¶14) (Miss. Ct. App. 2020) (emphasis added). Therefore, the decision to make or not objections falls squarely within the ambit of trial strategy.

¶43. Carnley has presented no evidence to overcome the presumption that trial counsel's decisions constituted trial strategy. Alternatively, "even if these omissions were not strategic choices but pure mistakes, the Sixth Amendment does not entitle the defendant to perfect counsel or one who makes no mistakes at trial." *Shinn v. State*, 174 So. 3d 961, 967 (¶16) (Miss. Ct. App. 2015). Because Carnley cannot overcome the presumption that his trial counsel's decisions "might be considered trial strategy," we find counsel's performance was not deficient. *Strickland*, 466 U.S. at 687.

> **B.** **Carnley's DNA argument is more appropriately brought during PCR proceedings.**

¶44. Carnley also argues his trial counsel was ineffective because he failed to request further DNA testing.

¶45. The Uniform Post-Conviction Collateral Relief Act expressly addresses matters

11

concerning DNA.  Under this statute, any person sentenced by a court may file a motion to request forensic DNA testing of biological evidence if

> there exists biological evidence secured in relation to the investigation or prosecution attendant to the petitioner's conviction not tested, or, if previously tested, that can be subjected to additional DNA testing, that would provide a reasonable likelihood of more probative results, and that testing would demonstrate by reasonable probability that the petitioner would not have been convicted or would have received a lesser sentence if favorable results had been obtained through such forensic DNA testing at the time of the original prosecution.

Miss. Code Ann. § 99-39-5(1)(f)(Rev. 2020).

¶46.   Because the PCR statute expressly addresses DNA testing, this issue is more appropriately brought during post-conviction proceedings. This specific claim on appeal is dismissed without prejudice to his opportunity to raise the matter in a post-conviction collateral attack.

### IV.   The jury was properly instructed to continue its deliberation.

¶47.   For his fourth assignment of error, Carnley argues the trial court committed error for failing to give the jury a *Sharplin* instruction.  Had the trial court given such an instruction, he argues, "it is very likely that the trial would have resulted in a hung jury, and ultimately acquittal for the Defendant."

¶48.   "[I]n a criminal case all twelve jurors must agree before they can return a verdict of guilty[.]" *Markham v. State,* 209 Miss. 135, 136-37, 46 So. 2d 88, 89 (1950).[3]

---

[3] In Mississippi, "[t]he right of trial by jury shall remain inviolate, but the legislature may, by enactment, provide that in all civil suits tried in the circuit and chancery court, nine or more jurors may agree on the verdict and return it as the verdict of the jury." Miss. Const., art. 3, § 31 (1890).  In *Markham*, the Supreme Court concluded that the express declaration in the Constitution that the agreement of "nine or more jurors" was sufficient in a civil case

¶49.    This is not necessarily quick or easy, but "[t]he object of the jury system is to secure a verdict by a comparison of views and by agreements among the jurors themselves." *Sharplin v. State*, 330 So. 2d 591, 596 (Miss. 1976). "Although the verdict of the jury should represent the opinion of each individual juror, it does not follow that opinions of jurors may not be changed by conference with each other in the jury room." *Id*.

¶50.    But sometimes these discussions break down, and the jurors may send a note to the trial court saying they cannot reach unanimity. "If the trial judge feels that there is a likelihood that the jury might reach a verdict, he may return the jury for further deliberations by simply stating to the jurors: 'Please continue your deliberations[.]'" *Id*.

¶51.    In the alternative, a trial court "may give the following instruction": "I know that it is possible for honest men and women to have honest different opinions about the facts of a case, but, if it is possible to reconcile your differences of opinion and decide this case, then you should do so." *Id*.; *see* MRCrP 23.4 (setting out the procedure when jurors are at an impasse). "Whether to give a *Sharplin* instruction is committed to the discretion of the trial judge[.]" *Keys v. State*, 219 So. 3d 559, 567 (¶28) (Miss. Ct. App. 2017).

¶52.    According to the record, about an hour after the jury was instructed and had retired to deliberate, a note was sent to the trial court. The trial court assembled both counsel for the

---

stood in contrast to an implied requirement that a criminal conviction required unanimity. *Markham*, 209 Miss. at 137, 46 So. 26 at 89. A trial court had refused an instruction in a criminal case informing the jury they needed to reach a unanimous verdict, and in reversing and remanding, the Court declared that "[i]n order that there may be no confusion in the minds of jurors engaged in the trial of a criminal case we think it is proper to instruct them in such cases that their verdict must be unanimous." *Id*.; *see Fulgham v. State*, 46 So. 3d 315, 324 (¶23) (Miss. 2010) (finding our State Constitution "has been interpreted to provide criminal defendants the right to a unanimous jury verdict of twelve impartial jurors").

State and the Defense. The note read, "If we can't all agree on a verdict about deliberations, what do we need to do?"

¶53. The trial court told the lawyers, "At this point in time we can do a *Sharplin* instruction if y'all would want it, or I can just write on here just keep going." The trial court then inquired, "What do y'all recommend we do?"—as is proper under Mississippi Rules of Criminal Procedure 23.23(a) (which "afford[s] the parties an opportunity to state their objections or assent" to any further jury instructions).

¶54. The first lawyer to respond was counsel for the defense: "I think we're a little early for a *Sharplin*." The trial court began to agree before the State jumped in, stating "Yeah. An hour in, yeah."

¶55. "Continue your deliberations?" the trial court asked, echoing the nearly fifty-year-old *Sharplin* instruction. Counsel for the defense then was recorded as saying, "Yep." "All right," declared the trial court, "I'm just going to put [']continue your deliberations,['] and that's it. Any objection?" The State responded, "No, sir." The jurors were so instructed. After further deliberation, the unanimous jury found Carnley guilty.

¶56. The procedure utilized by the trial court is exactly the one established by precedent and further codified by our Rules of Criminal Procedure. Counsel for the defense further assented to the procedure and declared it was "a little early" to give the *Sharplin* instruction, instead electing to have the jury be instructed to simply continue. The State agreed.

¶57. Having followed *Sharplin* with total precision, and with the assent of both sides in the trial, it was not an abuse of discretion for the trial court to instruct the jury to continue its

14

deliberations.

## V. The trial court did not commit cumulative error.

¶58. For his final issue, Carnley contends that the cumulative errors had a prejudicial effect that warrant relief when taken together. "Under the cumulative-error doctrine, individual errors may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2017). "However, where there is no error in part, there can be no reversible error to the whole." *Harris v. State*, 970 So. 2d 151, 157 (¶24) (Miss. 2007). Finding no merit to the other issues, there can be no cumulative error.

## CONCLUSION

¶59. Because Carnley's trial counsel failed to preserve the issue, we cannot reach the merits of Carnley's claim that the trial erred by not allowing him to impeach the victim with her prior statements to police. We also find the expert witness' testimony did not exceed the boundaries of his designation. Furthermore, trial counsel's decisions fall within the ambit of trial strategy; however, we find Carnley's DNA argument is more for post-conviction collateral proceedings. The trial court did not err by failing to give a *Sharplin* instruction. And finally, we find no cumulative error.

¶60. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

15