573 So.2d 1385 (1990)
Alton KELLEY
v.
G.J. FREDERIC, M.D.
No. 89-CA-1025.
Supreme Court of Mississippi.
December 27, 1990.
*1386 Gerald Maples, Maples & Lomax, Pascagoula, for appellant.
James H. Heidelberg, Bryant, Colingo, Williams & Clark, Pascagoula, for appellee.
Before DAN M. LEE, P.J., and ROBERTSON and BLASS, JJ.
ROBERTSON, Justice, for the Court:

I.
A veteran machinist and shipyard worker suffered a minor injury to his right ring finger in 1985. He claims that his treating physician's medical malpractice parlayed his injury into a substantial temporary total loss of use of his right hand, only partially corrected by surgery and leaving him with a residual physical and occupational disability. The Circuit Court dismissed the malpractice action summarily, on grounds plaintiff was without expert testimony that the defendant physician had offended his duty of care.
The case presents important questions concerning the administration of the summary judgment procedure. Rule 56, Miss. R.Civ.P. Specifically, we must consider whether and to what extent a patient's memory of the physician's course of treatment may, when it conflicts with the physician's contemporaneous records, create a genuine issue of material fact that would defeat a motion for summary judgment.

II.
Alton Kelley lives in Lucedale, Mississippi, and has been a machinist with Ingalls Shipbuilding in Pascagoula, Mississippi, since he began an apprenticeship program in 1959, upon his graduation from high school. On March 26, 1985, Kelley was so employed. While Kelley was changing a drill bit, the drill motor fell and the bit punctured his right ring finger at the phalanx. The drill was not running, nor was the bit turning at the time.[1] The injury left a small hole in Kelley's finger, and he went to the shipyard infirmary to seek help. Infirmary personnel then referred him to Singing River Radiology for x-ray, and he was thereafter referred to Dr. G.J. Frederic, who engages in the general practice of medicine in Pascagoula, Mississippi.
The details of Dr. Frederic's initial course of care are disputed, but what is clear is that Dr. Frederic shaped the third (middle), fourth (ring), and fifth (small) fingers of Kelley's right hand in partial flexion, the tips of the fingers touching the hand as though to cup a ball, and applied a light plaster cast. Kelley's hand remained immobilized in this position for some six weeks. He returned to Dr. Frederic approximately once a week and says he complained of pain, the tightness of the cast, and a foul odor it emitted. On one occasion, Dr. Frederic removed the cast and put a new one on. In Kelley's view, all that happened was his finger and hand seemed to get worse.
On June 27, 1985, Kelley sought the care and treatment of Dr. Morton F. Longnecker, Jr., an orthopedic surgeon who has his office in Biloxi, Mississippi. Upon examination, Dr. Longnecker found swelling and pain and numbness in Kelley's entire right hand. He described these as "the classic findings" of a carpal tunnel syndrome, a compression of the median nerve at the wrist of the right hand. Dr. Longnecker referred Kelley to Dr. J. Jackson, a neurologist, who performed an electrical study like unto a cardiogram and confirmed Dr. Longnecker's clinical impression. On July 11, 1985, Kelley entered the Gulf Coast Community Hospital where Dr. Longnecker surgically released the pressure of the median nerve in the carpal tunnel. After two months of aftercare, Kelley had experienced much improvement but still had stiffness in the right ring finger. Dr. Longnecker estimated that Kelley would experience a permanent disability estimated at twenty-five percent of loss of function of the ring finger and ten percent of loss of function of the long or middle finger on the right hand. Kelley has returned to work and has acquired a supervisory position *1387 where his disability is not so troublesome, at least from an occupational standpoint.
Believing that Dr. Frederic had been negligent in his initial course of treatment, Kelley filed suit in the Circuit Court of Jackson County charging medical malpractice and demanding actual, compensatory damages and even punitive damages. Dr. Frederic denied the claim and, after substantial discovery, moved for summary judgment, attaching in support his own affidavit as well as those of Dr. Daniel J. Enger and Dr. Christopher E. Wiggins, both orthopedic surgeons. The matter turned in substantial part on the interpretation of the deposition of Dr. Longnecker, to be noted further below. On August 10, 1989, the Circuit Court entered its order granting Dr. Frederic's motion for summary judgment and dismissing Kelley's complaint.
Kelley now appeals to this Court.

III.
In medical malpractice actions, our law provides that ordinarily a plaintiff may not recover without providing expert opinion testimony that the defendant physician failed to use reasonable care and skill. Palmer v. Biloxi Regional Medical Center, Inc., 564 So.2d 1346, 1354-55 (Miss. 1990); Phillips By and Through Phillips v. Hull, 516 So.2d 488, 491 (Miss. 1987); Cole v. Wiggins, 487 So.2d 203, 205 (Miss. 1986). The Circuit Court found the affidavits of Drs. Frederic, Enger and Wiggins[2] unequivocal in their opinion that Dr. Frederic had failed in no duty of care owed Kelley.
Dr. Longnecker again and again offered a like opinion, but always carefully confining himself to his review of Dr. Frederic's medical records. The point is central. Dr. Frederic's medical records reflect that on March 26, 1985, he first saw Alton Kelley and found a ruptured profundus tendon and a chipped bone and that he made an incision and repaired these. Assuming the correctness of this report of Dr. Frederic's initial clinical findings and course of care, Dr. Longnecker had no criticisms to offer. In other words, if a tendon repair was necessary, Dr. Frederic's course of treatment was, in Dr. Longnecker's opinion, within the range of minimally accepted care by general practitioners.
Our problem here is that Alton Kelley hotly disputes the accuracy of Dr. Frederic's records. Specifically, Kelley, in his affidavit, says
Dr. Frederic examined my finger, cleaned it and then took a pair of tweezers and removed a metal shaving from the small hole which the drill bit had made. He then put a bandage on my finger and a splint on my finger which he taped into place. No other procedures were performed.
Kelley emphatically denies that Dr. Frederic made any "incision of my finger," nor did he "repair a tendon, nor remove any bone fragments, nor give me any anesthetic."
In questioning Dr. Longnecker on deposition, Kelley's attorney posed a hypothetical question, assuming Kelley's version of the facts, asking Dr. Longnecker his opinion of Dr. Frederic's course of treatment.[3] In response to this and follow-up hypotheticals, Dr. Longnecker said
We're dealing with a puncture wound only, and I would think that would be extreme, to maintain a position of six weeks in this condition.
A few moments later, Dr. Longnecker added
On a hypothetical basis, you're indicating to me that there was no ruptured tendon, no lacerated condition, no bony fragment, ... I think that would be extreme treatment under anybody's hands, general *1388 practitioner, orthopedic surgeon, plastic surgeon.
And later, Dr. Longnecker repeated
I thought that [Dr. Frederic's course of treatment] was extreme for a puncture wound without, hypothetically, involvement of a profundus tendon or, hypothetically, involvement of bone with bony fragment. I think that's extreme. I think that this should be treated with local debridement, leave open, don't close it, perhaps a bandaid, and watch it closely for a few days with antibiotics and so forth. It should heal uneventfully. Now, that's hypothetically.
Again, assuming Kelley's version of the facts, counsel asked Dr. Longnecker if he would have treated Kelley as Dr. Frederic did, to which Dr. Longnecker answered, "I would not, no."
After giving these opinions, Dr. Longnecker was always quick to point out that Kelley's version of the facts was not correct, according to Dr. Frederic's medical records. Dr. Longnecker's testimony is clear that, if Dr. Frederic's records are correct, Dr. Frederic did not deviate from the level of care he owed Kelley.
The outcome determinative issue becomes whether there is a genuine issue as to what Dr. Frederic found and did in Kelley's initial visit on March 26, 1985. Dr. Frederic's notes reflect his finding that "the drill bit had evulsed a chip of bone with part of the flexor profundus tendon attached (which in effect was a compound fracture with displacement of the fragment of bone) and a partially detached flexor tendon." If we take this as true, and if we further accept Dr. Frederic's notes and testimony that he made an incision in Kelley's finger and surgically repaired the tendon and removed bone fragments, the judgment below must be affirmed. If this be our posture, Kelley is wholly without medical expert testimony suggesting that Dr. Frederic failed to meet any duty of care he owed Kelley and, as well, any medical expert testimony that Kelley's subsequent complication and difficulties may be attributable to any failures on the part of Dr. Frederic.
Without doubt, in a medical malpractice action a lay patient may give creditable testimony regarding purely factual matters and thus avoid summary judgment if those matters relate to material facts, notwithstanding the defendant physician's factual testimony to the contrary. On the other hand, there are matters in the realm of medical opinion where the lay plaintiff's testimony would be of little or no probative value and thus unable to raise a dispute of fact to the level of a "genuine issue." Though there be gray areas in between, we will allow lay plaintiffs few interpretive prerogatives regarding medical care and treatment.
Turning to the facts of this case, Dr. Frederic says he administered a local anesthetic, Lidocaine. Kelley says he did not. We must credit Kelley, for a person may credibly remember and state whether he was given a shot, though he may not know what the medication or substance injected may have been. Dr. Frederic says that he "debrided" the soft tissue and replaced the bone chip and attached tendon "into position in the phalanx and the wound was closed in layers." Kelley absolutely denies that this happened and says that all Dr. Frederic did was to take a pair of tweezers and remove a metal shaving. Here we think Kelley is in a position to know and remember whether an incision was made in his finger, although obviously if he had had no local anesthetic, he would remember this much more clearly.
In his effort to show that there was a genuine issue on the fact question of whether the incision and surgical procedure were performed, Kelley enlists the aid of Dr. Longnecker's deposition. Dr. Longnecker conceded that an incision of an inch and a half to two inches would have been normal with the kind of procedure described by Dr. Frederic's notes. Dr. Longnecker said he found no scar evidencing any such incision, although when he first saw Kelley on June 27, 1985, he was not particularly looking for such a scar. He was further asked if the x-rays made in his office indicated that there had been a bone chip present. Dr. Longnecker's x-rays *1389 showed no bone chip. He said that, "I think that three months, there should have been something there or some callous formation, bony healy of a bone chip." When asked if there had been a bone chip, should he have been able to see it on his x-ray, he answered, "I think so."
In the end, we limit what we may credit of Kelley's testimony to that which a lay person without medical training may reasonably be expected to observe, understand and remember. This at the very least includes Kelley's statement that Dr. Frederic examined his finger, cleaned it, took a pair of tweezers and removed a metal shaving, and placed a bandage and splint on his finger. It also includes his testimony that Dr. Frederic made no incision of his finger and administered no local anesthetic. We regard Dr. Longnecker's deposition as providing slight corroboration  at least in our present procedural posture  that Kelley is correct.
If Kelley's facts be accepted, the record then reflects an entirely credible opinion by Dr. Longnecker given on at least three occasions that the course of treatment prescribed and administered by Dr. Frederic was "extreme." We have Dr. Longnecker's further testimony that, taking Kelley's facts as correct, he would not have put the cast on Kelley's hand and pursued the course Dr. Frederic followed. To be sure, Dr. Longnecker never used the precise words "given these facts, Dr. Frederic deviated from the minimal standard of care required of physicians, etc." There is no magical form to which a plaintiff's supporting expert opinion must conform, so long as its import is apparent. Sufficient unto the day is Dr. Longnecker's opinion of what should have been done and of the fact that the course Dr. Frederic pursued was "extreme."
Under these circumstances, we hold that the fact of the initial findings and procedures performed by Dr. Frederic on March 26, 1985, was material within the meaning of Rule 56(c), Miss.R.Civ.P. We say this in the sense that, if the fact be as Dr. Frederic reports, there is no basis in this record for a finding of medical negligence, while, on the other hand, if the fact be as Kelley alleges, the opposite result obtains. We find further that the facts recited in Kelley's affidavit, coupled with the mild corroboration afforded by Dr. Longnecker's findings upon his initial examination in June of 1985, create a genuine issue on this material fact.
The Circuit Court erred when it granted Dr. Frederic's motion for summary judgment and dismissed Kelley's complaint. We reverse the judgment below and remand to the Circuit Court of Jackson County for such further proceedings as though the motion for summary judgment had been denied.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
NOTES
[1] This fact is disputed. In view of the fact that the case was decided below on summary judgment, we, of course, take plaintiff Kelley's version of how his accident occurred.
[2] The affidavits of Drs. Enger and Wiggins are wholly conclusory, reciting only that each had reviewed Dr. Frederic's medical records and that each found no failure of care on Dr. Frederic's part. Conclusory affidavits such as these, obviously drafted by defense counsel, have little value above that of the paper they are written on. See Walker By and Through Walker v. Skiwski, 529 So.2d 184, 186-87 fn. 2 (Miss. 1988).
[3] The record reflects that Dr. Frederic was present as counsel deposed Dr. Longnecker.