# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00711-COA

THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER            APPELLANT

v.

SONJA L. REDD, MOTHER AND NEXT FRIEND            APPELLEE
OF JOHVONTAYE T. JEFFERSON, A MINOR

| | |
|---|---|
| DATE OF JUDGMENT: | 05/25/2023 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | LEAH NICHOLS LEDFORD ROBERT V. GREENLEE |
| ATTORNEYS FOR APPELLEE: | KEN R. ADCOCK JAMES M. MARS II |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 11/05/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., LAWRENCE AND McCARTY, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. On November 4, 2018, following a vehicle accident, Johvontaye Jefferson had a closed and open reduction performed on his left ankle at the University of Mississippi Medical Center (UMMC) in Jackson, Mississippi. On November 14, 2018, Jefferson went to a scheduled ophthalmologist appointment and complained about worsening pain in his ankle. The ophthalmologist called an ambulance and had Jefferson transported to the UMMC emergency room. At UMMC Jefferson continued to complain of malodor and severe swelling of his left ankle. Jefferson's cast was removed, inspected, and recasted.

Jefferson was sent home after thirty minutes. The swelling worsened, and ultimately, after many months of continuous medical treatment, the left leg had to be amputated. Jefferson's mother, Sonja Redd, on Jefferson's behalf, brought a medical malpractice claim against UMMC. After a bench trial, the trial court found that the proof supported Jefferson's claim and entered a judgment against UMMC for the maximum amount allowed under the law, $500,000.00. UMMC appealed and claims three issues justify a reversal of the judgment. First, UMMC argues the trial court erred in finding that UMMC resident Dr. Justin Badon breached the standard of care in his treatment of Jefferson on November 14, 2018. Second, the hospital contends the trial court erred in finding that "ordering lab work and/or further testing [on November 14, 2018], would have revealed the infection and likely prevented the amputation." Finally, UMMC argues the trial court erred in finding Jefferson's expert witness was qualified to establish the standard of care. After review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2. On March 20, 2020, Sonja Redd filed a medical negligence lawsuit against UMMC on behalf of her son Johvontaye Jefferson over treatment received for his broken ankle after being in a vehicle accident. The pretrial proceedings were extensive but not directly relevant to the issues in this appeal. Ultimately, a bench trial occurred in the Hinds County Circuit Court on September 19-20, 2022.

¶3. At trial, Johvontaye Jefferson was called as a witness. He testified that on November 3, 2018, he was involved in a automobile accident in Brookhaven, Mississippi. He was

transported by ambulance to King's Daughters Hospital's emergency room in Brookhaven around 11:30 p.m. Jefferson was in need of immediate surgery due to a very serious ankle injury. King's Daughter Hospital was not equipped to treat Jefferson, so he was transferred to UMMC in Jackson, Mississippi. Jefferson arrived at UMMC around 3:00 a.m. on November 4, 2018. It was determined that Jefferson had a displaced fracture of the tibia, an angulation fracture of the fibula, and an orbital floor fracture.[1]

¶4. On November 4, 2018, ten hours after arriving at UMMC, Jefferson was taken to an operating room, and a closed reduction was performed on his injured ankle.[2] After the closed reduction was performed, Jefferson had a CT scan in preparation for further surgical intervention. Based on the findings of the CT scan, Jefferson was in need of an open reduction,[3] which was performed by Dr. Wright, a pediatric orthopedic surgeon at UMMC. Jefferson testified that on November 6, 2018, he was discharged from UMMC with instructions to return in three weeks.

---

[1] Dr. Wright explained in his testimony that a displaced fracture is when the fractured bones are no longer in alignment with each other and an angulation fracture is when the fractured bones are "angled in and punching into the soft tissue on the inside of his ankle." He also testified that if an angulation fracture is not reduced soon after the bone is fractured, skin breakdown and fracture blisters can result, which can ultimately cause an avenue for infection.

[2] Dr. Wright also explained in his testimony that a closed reduction is a procedure where a doctor uses his or her hands to realign the join and the bones. He testified that a closed reduction needs to be performed as soon as possible to minimize damage to the soft tissue, which can cause skin breakdown and lead to infection.

[3] An open reduction is a surgical produce that is used to remove bone fragments from the joint and place the bones back together with pins and screws.

¶5.     Jefferson also testified that on November 14, 2018, he went to a scheduled ophthalmology appointment for the orbital floor fracture he received from the automobile accident. The morning of his ophthalmologist appointment, Jefferson was "smelling a bad odor coming from [his] leg and it was getting way more swollen[.]" At the appointment, Jefferson asked the ophthalmologist if he "smell[ed] a bad odor" coming from his cast. The ophthalmologist agreed that there was an odor and swelling, so he called an ambulance to transport Jefferson to UMMC's emergency room (ER) even though the hospital was only "right around the corner." The ophthalmologist waited with Jefferson until the ambulance arrived.

¶6.     Jefferson testified that once he arrived to the ER, he was treated by Dr. Justin Badon, a first-year resident at UMMC. Jefferson told Dr. Badon about the increased pain, swelling, and smell. Jefferson described the pain as "severe pain." Jefferson's pain "was so bad that [he] barely could keep [his] eyes open" and "couldn't stop screaming or hollering . . . in pain." Dr. Badon took Jefferson's cast off to examine his ankle. His ankle had fracture blisters from the skin breakdown. Dr. Badon did not mention the possibility of an infection. However, Jefferson told Dr. Badon that "the bad odor that [Jefferson] was smelling smelled like an infection." Jefferson explained that he was familiar with the smell because his grandmother was very ill and had bedsores that "smelled like [his ankle did on November 14] when she was infected." Dr. Badon gave Jefferson pain medicine through an IV, took pictures of Jefferson's injured leg, put Betadine on the injured leg, replaced the cast over the

fracture blisters, and released Jefferson from the ER with an oral antibiotic prescription. The antibiotic Keflex was prescribed to prevent an infection from entering through the open fracture blisters. Dr. Badon was the only doctor who treated Jefferson on November 14.

¶7. Jefferson testified that on November 21, 2018, he returned to UMMC because the pain, smell, and swelling worsened. Once the doctors took the cast off, they told Jefferson he had a "major infection." The infection was from *Enterobacter cloacae* complex, a gram-negative bacteria. The infection led to Jefferson having twenty-three skin surgeries to help his "leg stay alive." While in the hospital, Jefferson developed Methicillin-resistant Staphylococcus aureus (MRSA) and e-coli, another bacterial infection that eventually led to Jefferson's below-the-knee amputation.

¶8. After Jefferson's amputation, he went to Methodist Rehabilitation Center (Methodist-Rehab) in Jackson where he learned "how to bathe on [his] own, get in and out of vehicles, use [his] upper body strength . . . [and] how to hop on one leg without any help." Jefferson also received a prosthesis from Methodist Rehab. The prosthesis allowed Jefferson to "get around but [he] hurt[s] very bad . . . [he] can't stand on it [for] long periods of time . . . [and he] can't walk too far," and when he "get[s] sores under [the bottom of his nub] . . . [he] can't walk on it at all."

¶9. Jefferson's attorney also called Sonja Redd, Jefferson's mother, to testify. Redd worked in home healthcare as a certified nursing assistant. She testified that while at the ER on November 14, 2018, a female doctor briefly stopped Redd and Jefferson when they first

arrived at the hospital, but Jefferson was only treated by Dr. Badon. Redd testified that she and Jefferson informed Dr. Badon about Jefferson's increased swelling and malodor. She explained that the smell became more potent when Dr. Badon removed Jefferson's cast. During her testimony, Redd was shown a picture of Jefferson's ankle from November 14, 2018. The photo was introduced into evidence. She explained that the picture looked similar to a "bad [skin] breakdown." She was familiar with skin breakdown from her years of working in nursing homes and taking care of elderly people. She testified that if she saw a skin breakdown in a nursing home, she "would have to report [it] . . . immediately" because it has a high risk of infection. Redd "knew that [Jefferson's ankle] was infected" when Dr. Badon removed Jefferson's cast. She testified that she "asked [Dr. Badon] why [were] they recasting it and sending us home" because she did not "feel comfortable going back home like this." She testified that Dr. Badon responded by saying, "Well, you're going to have to talk to your doctor." Dr. Badon then released Jefferson from the ER. Redd testified they were in the ER "[n]o later [sic] than 30 minutes. Just enough time to clean it and recast it."

¶10. Redd testified that at the beginning of February, Redd and Jefferson thought his leg was recovering because "that's what [the doctors] [were] telling [them]," but the day before Jefferson was to be released from the hospital, the doctors informed Jefferson that his leg needed to be amputated. When Jefferson's attorney asked Redd, "On November 14, 2018, if UMC had put him in the hospital when that skin started first breaking down, would he still have a left leg today?" Redd responded, "I feel like we would still have that left leg."

6

¶11. Prior to trial, Jefferson's attorney deposed Dr. Renato Bosita as an expert witness. That deposition was introduced as an exhibit at trial. Dr. Bosita worked at Texas Back Institute in Plano, Texas, as an orthopedic surgeon with a subspecialty in spine surgery for twenty years. Dr. Bosita attended medical school at the University of Chicago and graduated in 1996. During his internship and residency at Loyola University in Chicago from 1996 to 2001, he practiced in many different areas of medicine and was trained to treat infections or postsurgical infections. He also was trained in the subspecialties of orthopedic surgery, such as total joint spine, sports, trauma, foot and ankle, and hand surgery. During his residency, he saw many postoperative and nonoperative patients. Following his five-year residency training, he completed a year-long fellowship in spine surgery.

¶12. During Dr. Bosita's deposition, he testified that he was qualified as an expert in infections and compartment syndrome in a foot following a distal tibial fracture:

> As a board certified orthopedic surgeon, my certification is in all aspects of orthopedic surgery. And although my specialty has been in spine surgery and not orthopedic surgery of the foot, I am still qualified to see a patent in the ER and **can make an assessment to determine whether or not we should be suspicious that an infection is present, especially if surgery has been done**.

(Emphasis added). Dr. Bosita also testified and explained that he was familiar with the orthopedic standard of care. He stated:

> The standard of care is what a reasonable orthopedic surgeon would do in -- in a situation given the known variables of -- given the patient's history, their diagnostics, their previous surgery, what would a reasonable orthopedic surgeon do in the majority of the cases.

He also explained that he understood his opinions must be based on a reasonable degree of

7

medical probability:

> **Jefferson's counsel:** . . . you understand that in order to be acceptable to the Court, your opinions must be based on a reasonable medical probability as opposed to mere possibilities?

> **Dr. Bosita:** Yes, sir, I am aware of the standard of reasonable medical probability.

> **Jefferson's counsel:** Okay. Each time you answer a question that calls for an opinion, I'm not going to go back over that standard every single time as long as you tell me that you will not express any opinions that you don't hold to a reasonable degree of medical probability.

> **Dr. Bosita:** Yes, sir.

¶13. Dr. Bosita testified about a photograph of Jefferson's foot that had been taken on November 4, 2018. The photo was later introduced into evidence. Dr. Bosita stated that the foot had "some swelling," but otherwise, there was "no drainage wound or infection." Dr. Bosita was also shown a picture of Jefferson's foot from November 14, 2018. Dr. Bosita stated that the foot looked "dramatically different" compared to the picture from November 4, 2018. He stated that the "foot is more swollen . . . [and] has a glassy appearance." He also testified that according to the physical examination, the foot was much more painful. Dr. Bosita testified that it is not reasonable to send someone home from the hospital if their pain is out of control or if they are exhibiting severe pain, severe swelling, screaming out in pain and pain with passive motions of the toes which was mentioned on November 14. Dr. Bosita testified that Jefferson "should have been treated with more acuity," meaning "[v]ascular studies [and] labs" should have been ordered to "figure out why this foot is this swollen,[and]

8

why [Jefferson] is in this much pain." He further testified that "the workup should have been more[] aggressive to help figure out what's going on November 14." Dr. Bosita testified that "with early diagnosis of either compartment syndrome or infection, early treatment would have reduced significantly the likelihood that the negative events which ultimately resulted in amputation would have occurred." In Dr. Bosita's opinion, the twenty-three surgical procedures performed between November 21, 2018, and February 20, 2019, were the "sequela . . . of the delay in the diagnosis."

¶14. Dr. Bosita also testified that Dr. Badon never had an attending examine Jefferson's leg. Dr. Bosita's finding was based off the medical record. However, there is a discrepancy because Dr. Badon testified in his deposition that he did have an attending examine Jefferson's ankle. Dr. Bosita testified that his "biggest criticism is that an attending doctor should have seen [Jefferson's] foot" on November 14. Dr. Wright reviewed the records, but "they were not signed on the 14." "[T]o review [the records] afterwards is different from reviewing the situation and knowing what's happening realtime; . . . the critical decision-making has to happen at a given time."

¶15. Dr. Bosita testified that "[t]he most important thing . . . that someone in [Dr. Badon's] position should do . . . would be to make sure that [Jefferson] gets seen by an attending foot and ankle surgeon or a pediatric surgeon . . . or trauma surgeon . . . to perform an appropriate workup and assess for compartment syndrome and postoperative wound infection." He explained that based on a reasonable degree of medical probability, if Jefferson had received

9

care from an attending surgeon in the areas of podiatry, pediatrics, or trauma, and if the "infection or compartment syndrome were diagnosed earlier and definitive treatment had occurred sooner . . . hopefully, [Jefferson] would still have his leg."

¶16. On cross-examination, the defense attorney asked Dr. Bosita whether he would defer to an ankle surgeon if he were to treat and diagnose an injury similar to Jefferson's injury. Dr. Bosita responded, "I would definitely defer to the treatment of a foot and ankle surgeon and refer a case— if a case like this for some reason wound up in my clinic[.]"

¶17. Jefferson's attorney also called Dr. Patrick Wright, a UMMC pediatric orthopedic surgeon. Dr. Wright testified that a closed reduction should be done "as soon as it's medically indicated and reasonable for the patient's condition." At 12:14 p.m. on November 14, Jefferson's closed reduction was completed ten hours after his initial arrival at UMMC at 2:46 a.m. The closed reduction's completion was delayed because "it was deemed unsafe to do so by the emergency department requiring anesthesia intervention and an operating room," and "[p]erforming a closed reduction of a high-energy ankle fracture without some level of sedation would be a breach of the standard of care."

¶18. Dr. Wright also testified "[he] believe[d] that [Jefferson's] infection was actually spread through his blood from his gut into areas of swelling in his foot." Dr. Wright said that "because [Jefferson's] infection was a gram-negative enterococcus that lives in the gut and thus . . . the infection didn't develop around the fracture blisters." Dr. Wright was shown a picture Dr. Badon took on November 14 of Jefferson's ankle. Dr. Wright testified that the

10

picture "shows evidence of fracture blisters that have been weeping. There [was] also a pin from surgery that [was] sticking out as it was supposed to be, but no signs of purulence, no signs of infection."

¶19. During Dr. Wright's cross-examination, he testified that he reviewed and approved the care that Dr. Badon provided to Jefferson on November 14. He also testified that if he had been present with Dr. Badon when Jefferson was being treated, he would not have done anything differently than Dr. Badon. Dr. Wright explained that a patient with this type of injury would expect to be in pain and have swelling nine days after surgery. Jefferson was evaluated for compartment syndrome, and the medical record states the doctors treating Jefferson were "not concerned for compartment syndrome." Nothing in the report suggested that there was a foul odor present, even though Jefferson complained there was a smell. Dr. Wright hinted that the smell Jefferson referred to was from the skin under the cast not being able to be cleaned. Dr. Wright testified that the smell of an infection is "very different" than the odor that emanates from skin that is unable to be bathed under a cast.

¶20. When asked whether Dr. Badon should have run any laboratory tests, Dr. Wright responded:

> Not at nine days post-op. Those lab results are unreliable in that they could be elevated due to the trauma. They can be elevated due to the surgery itself that was performed. They can be elevated due to the closed reduction. They are indicators of inflammation in the body. They do not specifically point to an infection. So in order to use those lab results to diagnose an infection, you would have to couple those results with some sort of physical exam finding that indicates an infection which would be drainage from the wound, which would be, you know, swelling in specific areas, sutures that have popped with

11

a kind of beefy red edges to them. Those are signs of an infection.

When asked whether Dr. Badon should have ordered a vascular consult, Dr. Wright responded, "No. There [was] excellent blood supply to the toes with no compromise of his vessels nor [had] there ever been." Lastly, when Dr. Wright was asked whether Dr. Badon should have admitted Jefferson into the hospital on November 14, he responded,

> [T]here has to be an indication to admit someone to the hospital. You can't do that willy-nilly. He was appropriately treated in the emergency room with what amounts to a cast change and superficial wound care. He was given an antibiotic due to his fracture blisters having opened, and that would help prevent the setting in of infections that's coming from the skin. And his pain was now under control prior to leaving.

¶21. On redirect, Dr. Wright testified that he did not sign off on Dr. Badon's November 14 note until November 26. He explained that the gap in time was "unusual," but it was due to the fact that "the note didn't make it to [his] in-basket, in [UMMC's] electronic medical record until the afternoon of the 15th, and by then [he] was" out of town for a "long Thanksgiving break."

¶22. UMMC deposed Dr. Chad Hosemann of Capital Ortho in Jackson as an expert witness. That deposition was introduced as an exhibit at trial. Dr. Hosemann completed his residency at the University of Alabama at Birmingham and his one-year fellowship in orthopaedic sports medicine at Andrews Sports Medicine in Birmingham. Upon completion of his fellowship, Dr. Hosemann continuously worked for Capital Ortho for ten and a half years. In his career, he has treated patients with traumatic ankle injuries, performed open and closed reductions, and treated postoperative complications from ankle fractures such as

12

fracture blisters and infections.

¶23. Dr. Hosemann testified that Jefferson's injury was "definitely probably one of the worst pediatric fractures [he had] ever seen in [his] entire career." If an injury similar to Jefferson's came into Dr. Hosemann's clinic, he testified that "[he] would immediately take that patient probably to [his] surgery center and literally cancel every patient [he had] and get this thing reduced because, otherwise, you know, you're going to have some serious problems with soft tissue breakdown on the medial side of the ankle just because of the . . . trauma of the injury." Dr. Hosemann also testified that according to orthopaedic literature, "you would love to have [a fracture] reduced in . . . less than . . . two or three hours max."

¶24. When shown the picture of Jefferson's leg from November 14 at UMMC, Dr. Hosemann testified that he did not "see anything concerning." Further, he stated that he did not see anything in the medical records that indicated the presence of an infection or compartment syndrome on November 14. He testified that there was no breach in the standard of care by UMMC. However, when he was asked in his deposition, "[W]here does it say in the record that anybody else looked at [Jefferson's leg] other than [Dr. Badon]?" which was required by UMMC's protocol, Dr. Hosemann responded, "I don't believe it does."

¶25. After trial, the judge issued a written judgment finding that UMMC breached the standard of care. The trial court found Dr. Hosemann and Dr. Bosita were qualified in the field of orthopedic surgery. However, the trial court found Dr. Bosita's testimony was more

13

persuasive. The trial court ruled that Jefferson's complaints of malodor, swelling, and severe pain in his left ankle on November 14 should have warranted more than mere observation and re-casting by Dr. Badon. In the final judgment, the trial court was "of the opinion that any attempt further than simply observing the extremity for superficial signs of infection would meet the standard of care of a prudent Orthopedic physician." The trial court found, "ordering lab work and/or further testing would have revealed the infection and likely prevented the amputation." The judge entered a judgment against UMMC in the amount of $500,000.00. The court determined that the plaintiff proved past, present, and future medical expenses of approximately $800,000.00, which exceeded the $500,000.00 maximum allowed by law, and therefore entered judgment against UMMC in the amount of $500,000.00. UMMC now raises three issues on appeal: (1) the lower court's finding that Dr. Justin Badon breached the standard of care by not "ordering lab work and/or further testing" is not based on substantial evidence; (2) the lower court's finding that "ordering lab work and/or further testing would have revealed the infection and likely prevented the amputation" is speculative and not supported by substantial evidence; and (3) Dr. Bosita is not qualified to establish the standard of care for the diagnosis or treatment of a post-operative *Enterobacter cloacae* infection in a foot or ankle or to establish causation. We address each of these contentions in turn below.

## STANDARD OF REVIEW

¶26. "A circuit court judge sitting without a jury is accorded the same deference with

regard to his findings as a chancellor." *Puckett v. Stuckey*, 633 So. 2d 978, 982 (Miss. 1993) (citing *Kight v. Sheppard Building Supply Inc.*, 537 So. 2d 1355, 1358 (Miss. 1989).

¶27. "The standard by which an appellate court reviews factual determinations made by a trial judge sitting without a jury is the substantial-evidence standard." *Delta Reg. Med. Ctr. v. Venton*, 964 So. 2d 500, 503 (¶4) (Miss. 2007). The judge's finding will be upheld when the findings "are supported by substantial, credible, and reasonable evidence." *Id.* To determine whether the trial court's finding was based on substantial, credible, and reasonable evidence, this Court will assess the entire record and must accept "that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact." *Cotton v. McConnell*, 435 So. 2d 683, 685 (Miss. 1983) (quoting *Culbreath v. Johnson*, 427 So. 2d 705, 707-08 (Miss. 1983)).

¶28. The Mississippi Supreme Court has stated that "[c]onflicting testimony in the record is to be resolved by the trier of fact." *Scott Addison Constr. Inc. v. Lauderdale County Sch. Sys.*,789 So. 2d 771, 773 (¶8) (Miss. 2001). The standard of review for reviewing the trial court's admissibility of evidence, including expert testimony, is abuse of discretion. *Jones v. State*, 918 So. 2d 1220, 1223 (¶9) (Miss. 2005); *Miss. Transp. Comm'n McLemore*, 863 So. 2d 31, 34 (¶4) (Miss. 2003); *McGowen v. State*, 859 So. 2d 320, 328 (¶26) (Miss. 2003).

## ANALYSIS

I.  **Whether the trial court's finding that Dr. Badon breached the standard of care by not "ordering lab work and/or further testing"**

15

**is not based on substantial evidence.**

¶29.   UMMC argues that the trial court's finding of Dr. Badon's breach was not based on substantial evidence because Dr. Bosita's testimony regarding what a reasonable orthopedic surgeon would do in a "majority of cases" did not establish the applicable standard of care, and Dr. Bosita's opinion that Jefferson should have been treated with "more acuity" is insufficient to establish the standard of care.

¶30.   A plaintiff is required to prove the following elements to establish a prima facie case of medical malpractice:

> (1) The existence of a duty on the part of the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) A failure to conform to the standard required of the defendant; (3) An injury to the plaintiff proximately caused by the breach of such duty by the defendant;

*Drummond v. Buckley*, 627 So. 2d 264, 268 (Miss. 1993).

¶31.   For a plaintiff to properly establish medical malpractice of a physician, an expert witness[4] is required to "articulate a specific, objectively-determined standard of care." *Est. of Northrop v. Hutto*, 9 So. 3d 381, 382, 384 (¶¶1, 9) (Miss. 2009).  The expert must also

---

[4]  Mississippi Rule of Evidence 702 defines an expert witness:  "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case."

establish that the failure to abide by the standard of care was "the proximate cause, or proximate contributing cause, of the alleged injuries." *McDonald v. Mem'l Hosp. at Gulfport*, 8 So. 3d 175, 180 (¶12) (Miss. 2009) (quoting *Barner v. Gorman*, 605 So. 2d 805, 809 (Miss. 1992)). "Absent expert medical testimony that articulates the duty of care a physician owes to a particular patient under the circumstances and identifies the particular point that the physician breached that duty and caused injury to the plaintiff, a plaintiff's claim for negligence must fail." *Stuart v. St. Dominic-Jackson Mem'l Hosp.*, 311 So. 3d 1192, 1202 (¶50) (Miss. Ct. App. 2020) (quoting *Potter v. Hopper*, 907 So. 2d 376, 380 (¶10) (Miss. Ct. App. 2005)).

¶32.    In *Kelley v. Frederic*, 573 So. 2d 1385, 1389 (Miss. 1990), the Mississippi Supreme Court explained what is needed for an expert's standard of care to be properly established. In *Kelley*, a patient filed a medical malpractice claim against their doctor after a minor injury resulted in the "substantial temporary total loss of use" of his right hand. *Id.*  At trial, an expert testified that the doctor's treatment of the patient was extreme and that the expert would not have pursued that course of treatment. *Id.* The relevant portion of the expert's testimony was quoted directly by the court as follows:

> **Expert Witness:** We're dealing with a puncture wound only, and I would think that would be extreme, to maintain a position of six weeks in this condition.
>
> **Expert Witness:** On a hypothetical basis, you're indicating to me that there was no ruptured tendon, no lacerated condition, no bony fragment, . . . I think that would be extreme treatment under anybody's hands, general practitioner, orthopedic surgeon, plastic surgeon.

17

> **Expert Witness:** I thought that [Dr. Frederic's course of treatment] was extreme for a puncture wound without, hypothetically, involvement of a profundus tendon or, hypothetically, involvement of bone with bony fragment. I think that's extreme . . . .

*Id.* at 1387-88. Furthermore, the expert was asked at trial if he would have treated Kelley as Dr. Frederic did. He responded, "I would not, no." On appeal, the issue was whether the expert established the appropriate standard of care. *Id.* The Mississippi Supreme Court found that "[t]here is no magical form to which a plaintiff's supporting expert opinion must conform, so long as its import is apparent." The Court found that the expert's opinion was sufficient to establish the standard of care despite his failure to use the words "minimal standard of care required of physicians." *Id.*

¶33. More recently, our Supreme Court again examined what is needed to establish the applicable standard of care in *McGee v. River Region Medical Center*, 59 So. 3d 575 (Miss. 2011). In *McGee*, the conservator of the patient's estate filed a medical malpractice claim against a hospital because the patient suffered an intravenous infiltration and burns, which lead to nerve damage and permanent disfigurement. *Id.* at 577 (¶4). At trial, Dr. Beare was qualified and accepted as the patient's expert. *Id.* at 579 (¶13). She testified "more than once" that she was "familiar with the applicable standard of care." *Id.* However, the trial judge prohibited Dr. Beare from rendering an opinion on the case because the patient's counsel failed to establish that Dr. Beare was familiar with the applicable standard of care. *Id.* at 579- 80. The conservator appealed, arguing that the trial court erroneously prohibited Dr. Beare from rendering an opinion on the case. *Id.* The Mississippi Supreme Court found that

18

an expert's testimony of the applicable standard of care is often intertwined with their testimony of whether a breach occurred. *Id.* Thus, the Mississippi Supreme Court held that Dr. Beare was "allowed to articulate her opinion as to whether that standard of care had been breached" because she was qualified and accepted as an expert, and she testified more than once that she was familiar with the applicable standard of care. *Id.*

¶34. The Mississippi Supreme Court was presented with the same issue in *Hutto*, but it resulted in a different outcome. In *Hutto*, the patient brought a medical malpractice action against a hospital, anesthesiologist, and nurse anesthetists for the "lack of monitoring of intravenous catheter (IV) during surgery resulted in extravasation." *Hutto*, 9 So. 3d at 384 (¶10). During the patient's expert witness's deposition, the expert explained the standard of care for visual inspections and palpitations of IV injections. *Id.* at 387 (¶11). When the expert was asked whether "any of the medical articles and texts he brought to his deposition contained a confirmation of his position, he replied, 'they do not specifically say CRNAs should be monitoring anything in particular.' He summed up the articles by saying they require constant vigilance." *Id.* at 387 (¶12). The expert also explained the proper way for an anesthesiologist or CRNA (certified registered nurse anesthetist) to document blood pressure readings by stating that "[t]he only thing I can tell you is that from personal—and the way I teach my residents to do it is . . . But that's personal. That's not universally accepted. That's my personal way of doing it." *Id.* at 386-87. The defendants moved and the court granted summary judgment because the expert did not state that the providers

19

should have monitored anything in particular, rather he stated only that standard of care required "constant vigilance," and the "expert's personal preferences did not establish a national standard of care." *Id.*

¶35.    Here, Dr. Bosita was asked if he was "familiar with the standard of care" for an orthopedic surgeon, Dr. Bosita responded in the affirmative. He testified that "[t]he standard of care is what a reasonable orthopedic surgeon would do in . . . given the patient's history, their diagnostics, their previous surgery, what would a reasonable orthopedic surgeon do in the majority of the cases." Dr. Bosita's definition of the standard of care is sufficient because there is no "magical form" he must conform to, and his import was apparent. *See Kelley*,573 So. 2d at 1389.

¶36.    Dr. Bosita's articulation of the standard of care can be distinguished from *Hutto's* expert witness' failure to establish the standard of care because Dr. Bosita testified to the breaches of the standard of care with "particularity." *See. Hutto*, 9 So. 3d at 387 (¶12). UMMC argues that Dr. Bosita's opinion does not establish the standard of care because Dr. Bosita did not "enunciate a specific course of action that a minimally competent physician would have taken." *Conn v. United States*, 880 F. Supp. 2d 741, 745 (S.D. Miss. 2012).  Dr. Bosita did, however, "enunciate[] a specific course of action" by stating that UMMC breached the standard of care because the "attending doctor should have seen [Jefferson's] foot . . . on November 14." Furthermore, he particularly explained that Jefferson should have been admitted to UMMC and treated with more "acuity," which means having "vascular

studies" and "labs" done "to assess for infection." Because Dr. Bosita particularly explained what UMMC could have done to comply with the standard of care, the trial court's finding was based on substantial evidence.

> **II.** **Whether the trial court's finding that "ordering lab work and/or further testing would have revealed the infection and likely prevented the amputation" is speculative and not supported by substantial evidence.**

¶37. UMMC's argument that the trial court's finding was speculative and not supported by substantial evidence is three-fold. First, UMMC claims Jefferson failed to establish that the *Enterobacter cloacae* infection was present on November 14, 2018. Second, UMMC argues there was no evidence that any specific test would have "revealed the infection." Third, UMMC contends there was no evidence that any specific course of treatment would have "prevented the amputation."

¶38. The "lost chance of recovery" doctrine governs when a patient alleges that "a medical provider failed to administer proper care and that the failure allowed an already existing injury to deteriorate." *Griffin v. N. Miss. Med. Ctr.*, 66 So. 3d 670, 673 (¶7) (Miss. Ct. App. 2011). The claim for lost chance of recovery required "proof of causation to a degree of reasonable medical probability that—absent the alleged malpractice—a significantly better result was probable, or more likely than not (i.e., a greater than 50 percent chance of a substantially better outcome than was in fact obtained)." *Ladner v. Campbell*, 515 So. 2d 882, 889 (Miss. 1987). The Mississippi Supreme Court recognized that the plaintiff is rarely able to prove to an "absolute certainty what would have happened if early treatment, referral

21

or surgery had happened." *Clayton v. Thompson,* 475 So. 2d 439, 445 (Miss. 1985). Because proof of absolute certainty is difficult to prove, experts tend to disagree. "In the event of conflicting expert testimony, the finder of fact must evaluate the basis for each expert opinion and decide which is more credible." *Whittington v. Mason*, 905 So. 2d 1261, 1266 (¶25) (Miss. 2005).

¶39. This Court discussed whether an expert's opinions on causation were speculative rather than absolutely certain in *Stuart*, 311 So. 3d at 1197 (¶1). In *Stuart*, a patient brought an action against a hospital and a physician for medical malpractice. *Id.* The patient claimed that a lumbar puncture procedure left him partially paralyzed. *Id*. at (¶6). At trial, the expert witness testified that "he did not have the information available for him to make an assertion, to a reasonable degree of medical probability, that the positioning caused [the patient's] spasms. *Id.* at 1209 (¶92). However, he did testify "to a reasonable degree of medical certainty or probability, that the forcible raising [the patient's] arms breached the standard of care." *Id*. The trial court granted summary judgment in favor of the hospital. *Id.* at 1198. (¶1). On appeal, the hospital argued that the expert witnesses' opinions regarding the causation were speculative and inadmissible. *Id.* at 1208. We held that medical experts are not required to testify to an absolute certainty, *id.* at 1209 (¶94), citing *Mariner Health Care Inc. v. Estate of Edwards ex rel. Turner*, 964 So. 2d 1138, 1114 (¶8) (Miss. 2007), and stated that medical experts are "**not** require that expert testimony **conclusively establish the cause of [injury**]." (Emphasis added). Rather, "expert testimony must, at a minimum, show that

22

deviations from the standard of . . . care caused or contributed to the [injury]." *Id.* at 1209 (¶94).

¶40. This Court ruled on a loss chance of recovery issue in *Singing River Health System v. Brand*, 380 So. 3d 282, 290 (¶38) (Miss. Ct. App. 2023), *cert denied*, 379 So. 3d 337 (Miss. 2024). In *Singing River,* a patient's estate filed a medical malpractice claim against Singing River Hospital asserting that there was a breach in the standard of care because the delay in her treatment ultimately lead to the patient's death. *Id.* at 287 (¶23). The patient's expert concluded that but for "the delay in involving interventional radiology following the bleeding episode[,] . . . the lack of interventional radiology availability, and [the] lack of consultation with the surgery service are below that standard of care" the patient "more likely than not . . . would have survived." *Id.* at 288 (¶23). This Court found that the patient's estate provided sufficient evidence to prove causation under the loss chance of recovery theory. *Id.* In these cases, experts' testimony often present conflicting opinions on the evidence, requiring the trier of fact to resolve the issues.

¶41. The Mississippi Supreme Court discussed conflicting expert testimonies in *Memorial Hospital at Gulfport v. White*, 170 So. 3d 506, 508 (¶9) (Miss. 2015). In *White*, a patient filed a medical malpractice suit against a hospital. *Id.* at 507 (¶5). The trial judge found for the patient. *Id.* On appeal, the hospital argued that the patient's expert witness's testimony was against the substantial, credible, and reasonable evidence on the issue of medical causation. *Id.* at 508 (¶8). The Mississippi Supreme Court found that the issue was "nothing

more than a classic example of a 'battle of the experts.'" *Id*. at 509 (¶13). The patient

presented experts who supported a reasonable probability of a "substantially better outcome",

whereas the hospital offered expert testimony that supported only a "potential chance of a

substantially better outcome." *Id.* The Mississippi Supreme Court affirmed the trial court's

finding because the fact-finder "determines the winner of a battle of the experts." *Id*.

¶42.    The Mississippi Supreme Court has constantly held that when "experts' testimony . . .

conflicts considerably . . . the trier of fact is to resolve conflicting testimony." *Univ. of Miss.

Med. Ctr. v. Foster*, 107 So. 3d 149, 153 (¶26) (Miss. 2013). This court "will not disturb

those findings merely because the judge adopts the testimony of one party's experts over the

views expressed by another party's experts." *Id*. at 151 (¶11).

¶43.    UMMC's argues that the judge's finding was speculative because the plaintiff did not

prove that (1) the *Enterobacter cloacae* was present on November 14, 2018; (2) any specific

test would have revealed the infection; and (3) any specific course of treatment would have

prevented the amputation. However, precedent does not require the plaintiff's expert to

testify to causation with "absolute certainty." *Stuart*, 311 So. 3d at 1209 (¶94). Dr. Bosita

was only required to prove causation to a degree of reasonable medical probability. *Id*.

¶44.    In Dr. Bosita's deposition, he explained that he understood the medical probability

standard:

> **Jefferson's Counsel:** All right. Your answers to the questions in this case or
> your answers to the -- what you -- we asked you to do, you understand that in
> order to be acceptable to the Court, your opinions must be based on a
> reasonable medical probability as opposed to mere possibilities?

24

**Dr. Bosita:** Yes, sir, I am aware of the standard of reasonable medical probability.

**Jefferson's Counsel:** Okay. Each time you answer a question that calls for an opinion, I'm not going to go back over that standard every single time as long as you tell me that you will not express any opinions that you don't hold to a reasonable degree of medical probability.

**Dr. Bosita:** Yes, sir.

Dr. Bosita stated, "with early diagnosis of either compartment syndrome or infection, early treatment **would have reduced significantly** the likelihood that **all the negative events** which ultimately resulted in amputation would have occurred." If Jefferson care was not delayed "**definitive treatment would have occurred sooner** and, hopefully, [Jefferson] would still have his leg." (Emphasis added). Dr. Bosita also explained that the surgical procedures performed on Jefferson from November 21, 2018, through February 10, 2019, were the "sequelae" of the "delay in diagnosis" on November 14, 2018. The trial court's findings were not "speculative" because Jefferson provided substantial evidence that proper treatment would have provided him with greater than a fifty-percent chance of a better result.

¶45. Further, in this trial, there was clearly a battle of the experts at play. *See Clark v. State*, 315 So. 3d 987, 997 (¶23) (Miss. Ct. App. 2024), *Fonville v. Zeid*, 327 So. 3d 658, 670 (¶36) (Miss. Ct. App. 2021), *Kirk v. Newton*, 380 So. 3d 252, 273 (¶53) (Miss. Ct. App. 2023). Dr. Bosita testified explicitly that UMMC breached the standard of care, while Dr. Hosemann stated that UMMC did not. Dr. Bosita testified that his "biggest criticism [was] that an attending doctor should have seen [Jefferson's] foot" on November 14, which was

required under UMMC's protocol. Dr. Hosemann testified that UMMC did not breach the standard of care even though an attending doctor did not look at Jefferson ankle on November 14. The experts also had conflicting testimonies regarding the treatment Jefferson received. Dr. Bosita testified that Jefferson's ankle looked "drastically different" on November 14 compared to November 6. He stated that the Jefferson's foot was "more swollen . . . [and] ha[d] a glassy appearance," which would require the doctors "to perform an appropriate workup and assess for compartment syndrom and postoperative wound infection." In contrast, Dr. Hosemann testified that he did not "see anything concerning" regarding Jefferson's foot on November 14, 2018. He stated that he did not see anything in the medical records that indicated the presence of an infection or compartment syndrome on November 14. It is the province of the trial court, acting as the finder of fact, to determine the credibility of the experts and determine the weight and worth of their testimony. *See White*, 170 So. 3d at 509 (¶13). This Court will not "reweigh the facts nor substitute its judgment for that of the fact finder as to credibility issues." *McFadden v. Miss. State Bd. of Med. Licensure*, 735 So. 2d 145, 152 (¶26) (Miss. 1999). Here, there was substantial evidence to support the trial court's findings of fact and conclusions of law.

**III.** **Whether Dr. Bosita is qualified to establish the standard of care for the diagnosis or treatment of a post-operative *Enterobacter cloacae* infection in a foot or ankle or to establish causation.**

¶46.   For the last assignment of error, UMMC argues that the trial court abused its discretion because Dr. Bosita was not a qualified expert to establish the standard of care for

26

the diagnosis or treatment of a post-operative *Enterobacter cloacae* infection in a foot or ankle or to establish causation.

¶47.    "It is generally not required that an expert testifying in a medical malpractice case be of the same specialty as the doctor about whom the expert is testifying." *Hubbard v. Wansley*, 954 So. 2d 951, 957 (¶13) (Miss. 2007).  Rather, "it is the scope of the witness'[s] knowledge and not the artificial classification by title that should govern the threshold question of admissibility."  *West v. Sanders Clinic for Women P.A.*, 661 So. 2d 714, 718 (Miss.1995). "Satisfactory familiarity with the specialty of the defendant doctor is, however, required in order for an expert to testify as to the standard of care owed to the plaintiff patient." *Id.* at 718-19.

¶48.    The Mississippi Supreme Court ruled on a similar issue in *Causey v. Sanders*, 998 So. 2d 393, 399 (¶13) (Miss. 2008). In *Causey*, a patient's daughter filed a medical malpractice suit against UMMC alleging that the misdiagnosis made by UMMC caused the patient to be put in hospice care where she was given an overdose of medication. *Id.* at 397 (¶5). At trial, the plaintiff called four medical expert witnesses: a gastroenterology/internal medicine doctor; a pharmacologist/toxicologist; a forensic pathologist; and a forensic toxicologist. *Id.* at 399 (¶15).  All four of the experts testified that the defendant violated the standard of care *Id.* at 400 (¶16).  The trial court ruled for the patient and the UMMC appealed.  *Id.* at 398 (¶11).   On appeal, the defendant argued that "while these experts are qualified and well-versed in their respective fields, they were not qualified to testify in the field of hospice

and palliative medicine." *Id.* at 400 (¶17). The Mississippi Supreme Court relied on *Brown v. Mladineo*, 504 So. 2d 1201, 1202 (Miss. 1987), and stated that the "general rule as to expert testimony in medical malpractice actions is that a specialist in a particular branch within a profession will not be required. Most courts allow a doctor to testify if they are satisfied of his familiarity with the standards of a specialty, **though he may not practice the specialty himself**." *Causey*, 998 So. 2d at 408 (¶23) (quoting *Brown*, 504 So. 2d at 1202). (emphasis added) (citation and internal quotation marks omitted). The Court found that the trial judge did not abuse her discretion in allowing the plaintiff's experts to testify as to the violation of the standard of care by the defendant because the fact-finder was given great deference and was "provided with conflicting expert testimony and rendered their decision accordingly." *Id.*

¶49.    Here, Dr. Bosita was the same specialty as Dr. Wright, as they both were orthopedic surgeons. The difference was Dr. Bosita more specialized training as a result of his extra year fellowship in spinal surgery. Although, Dr. Bosita primarily practiced in the field of spinal surgeries, he was still an orthopaedic surgeon by his training and practice. Dr. Bosita was certainly familiar with the standards of care for an orthopedic surgeon. Dr Bosita testified he was qualified to see a patient in the ER and make an assessment whether "we should be suspicious that an infection is present, especially if surgery has been done." This issue is without merit.

**CONCLUSION**

28

¶50.    We find there was substantial evidence to support the trial court's findings of facts and conclusions of law.  The trial judge listened to both parties' expert testimony and resolved the factual issues after weighing the evidence and credibility of the experts. Further, Dr. Bosita was qualified to testify as to the applicable standard of care and causation.

¶51.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WEDDLE, J., NOT PARTICIPATING.**